GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
JOHN PAUL REICHMUTH
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:    (510) 637-3507
Email:          John_Reichmuth@fd.org

Counsel for Defendant Sanchez

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUIS SANCHEZ,<br><br>Defendant. | Case No.: CR 21–0113 YGR<br><br>**SENTENCING MEMORANDUM ON BEHALF OF LUIS SANCHEZ**<br><br>**Court:**   Courtroom 1, 4th Floor, Oakland Courthouse<br>**Hearing Date:**   November 4, 2021<br>**Hearing Time:**   1:00 p.m. |

**I.     INTRODUCTION**

Mr. Sanchez, whom all parties agree served as a minor participant in this offense, is a very unlikely methamphetamine courier. He is a good person, a lawful resident of this country who worked full-time for more than a decade and accumulated no contacts with the criminal justice system until he committed a "grave error," for reasons he doesn't even fully understand. He is extremely unlikely to recidivate. He will be deported at the conclusion of his sentence. The defense agrees with the calculations in the Presentence Report (PSR) and agrees that a downward variance is warranted. However, Mr. Sanchez respectfully requests a more significant variance to 24 months incarceration.

There are three reasons for this: First, the pandemic has dramatically changed the severity of custody by increasing health risks and reducing opportunities for visits and programming. Second, Mr. Sanchez's guidelines have been driven by an arbitrary 10:1 ratio between actual methamphetamine and a mixture thereof and the fortuity that the controlled substances were sent to the lab for purity testing, an arbitrary decision that causes wild swings in sentencing exposure in methamphetamine cases. Third, this is highly aberrant conduct for Mr. Sanchez, who led a hard-working and law-abiding life before committing this offense. A two-year federal prison sentence, followed by deportation, is sufficient but not greater than necessary to fulfill the goals of sentencing for a low-level courier with no criminal history.

## II.     STATEMENT OF FACTS

The drug trafficking organizations have made it very easy for decent, ordinary people to sacrifice their futures and bear all of the risk. The process is anonymous and practically automated. Mr. Sanchez truthfully told agents: "I don't know anything, everything was by message, I get a message and I go, I don't know anyone." PSR ¶ 11. As noted in the PSR, "Sanchez was a courier taking directions and acting upon the instructions of Saul. It does not appear he exercised decision-making authority nor stood to profit significantly in the criminal activity." PSR ¶ 13. Mr. Sanchez is an unlikely courier. He has had a good life. Besides the loss of his sister at a young age, and leaving home and experimenting with drugs at age 14 and 15, respectively, he did not experience a traumatic childhood. Mr. Sanchez did not commit this offense because he was looking for work, either. Prior to this offense, Mr. Sanchez worked full-time for 14 continuous years:

"Prior to his arrest in the instant offense, he was working at Curtiss-Wright in Aliso Viejo, California constructing parts for planes and computer programs. This was corroborated by his sister. He worked for approximately one year. Prior to that, he was employed at numerous furniture companies in the packaging department. Specifically, he worked full-time at Brown Jordan for eight years and worked full-time at Fairchild for five years." PSR ¶ 50. And Mr. Sanchez did not commit this offense because he has difficulty following the law. Quite the contrary, he has led a law-abiding life, except for this very brief period. He has been on pretrial release for 15 months with no violations. PSR ¶ 4. So why did he commit this offense? Even he has a hard time understanding

why he did it, and that is exactly how drug trafficking organizations want it.

This "loving, giving, and noble person," PSR ¶ 42, who led a "boring" life told the Probation Officer, "without warning, you make mistakes," your friends and the people around you influence you, and "that is what happened to me." He observed that he has disappointed his family "so intensely," as they never expected this from him. He stated that he accepts responsibility as he "realized he made a very grave error, a bad decision. I'm aware that it affects many, many people, youth, the community, a lot of people. I feel profound remorse. I always wanted to do everything by the book."[1] He is a good person who is deeply disappointed in himself and surprised that he allowed himself to make such a tragic decision. Mr. Sanchez should not be so surprised. These organizations are very good at facilitating the process by which decent people like Mr. Sanchez find themselves drug couriers without much reflection, "without warning."

### III.  ARGUMENT

#### A.  The Sentencing Factors under 18 U.S.C. § 3553(a).

Under federal law, *every day of incarceration must be necessary*. The court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at a sentencing determination. The Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2). In this case, the risk of recidivism is very low, so specific deterrence is unnecessary. The public needs no protection from

---

[1] Quotations in this paragraph not cited to the PSR are direct quotes from notes of counsel from the Presentence Interview.

SENTENCING MEMORANDUM
*SANCHEZ*, CR 21–0113 YGR

3

Mr. Sanchez. He has been free on bond in another district without incident. A sentence beyond 24 months is not necessary.

### B. A sentence that takes no account of the pandemic is plainly unreasonable.

The Sentencing Guidelines were formulated without any consideration of the COVID-19 Pandemic. The Court should adjust them accordingly. When Mr. Sanchez is incarcerated, his odds of contracting COVID-19 will remain elevated significantly, even assuming that he and others around him are vaccinated. The COVID-19 infection rate within prison generally, and BOP facilities specifically, far outpaces the infection rate in the United States. Saloner, et al., "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA, Jul. 8, 2020, https://jamanetwork.com/journals/jama/fullarticle/2768249. Mr. Sanchez has experienced a death in the family due to COVID-19. PSR ¶ 39. Furthermore, Mr. Sanchez has a history of morbid obesity, a known risk factor for severe COVID-19, which is presently under control. PSR ¶ 44.

Even with great vigilance, a high risk remains because of the nature of close confinement. In the federal prison system, there have been over 47,000 cases of COVID-19 out of 125,000 total inmates. https://www.bop.gov/coronavirus/. Even within a system that has adapted to the pandemic, with a high number of recovered and vaccinated people, Mr. Sanchez will very likely be re-exposed a number of times over the course of a 24-month sentence. The durability of immunity is not known, though there are reasons for optimism. Burton, D.R., Topol, E.J. Toward superhuman SARS-CoV-2 immunity?. Nat Med 27, 5–6 (2021). https://doi.org/10.1038/s41591-020-01180-x. That exposure should be relevant under 3553(a). Even if there is a substantial winding down of the pandemic both in and out of custody, which is by no means guaranteed, there will likely be clear risk to Mr. Sanchez and other worsening of conditions because of COVID-19, and these factors are not accounted for in his Guidelines calculations.

Other district courts have recently cited the harsh prison conditions and lack of programming opportunities due to the coronavirus as reasons to vary downward in imposing sentence. The circumstances in this case are very much like those in the case of *United States v. Armstrong*, where the court imposed, on compassionate release, a 21-month sentence for more than three times the quantity of methamphetamine as was involved in this case, and noted that many similar defendants

have received sentences around 24 months, strongly implicating the issue of sentencing parity:

> [T]he Court is aware that defendants committing similar offenses now, in the time of COVID-19, are receiving vastly lower sentencing recommendations, because their time in custody is harsher. Those with pre-existing conditions, like diabetes, are receiving particularly favorable recommendations. Many are receiving sentences around 24 months—the amount of time Mr. Armstrong has already served in custody. Therefore, the Court finds reducing Mr. Armstrong's sentence would also avoid unwarranted disparities between similarly situated defendants.

*United States v. Armstrong*, No. 18-CR-5108-BAS-1, 2020 WL 4366015, at *4 (S.D. Cal. July 30, 2020) (granting compassionate release after 21 months on 46-month sentence for smuggling 35 kilograms of methamphetamine into United States). *Accord United States v. William White*, 19-cr-325-RC (D.D.C. Aug. 5, 2020) (referring to more punitive and less rehabilitative conditions at the jail due to COVID-19); *United States v. Antonio Cox*, 19-cr-235-JDB (D.D.C. July 29, 2020) (acknowledging lack of programming due to COVID-19). The reality of COVID in prisons is one of restricted conditions, with camp inmates sent to single cells or solitary confinement, repeated quarantines, reduced programs and visits, abrupt cancelations, and constant uncertainty. Though the end may be in sight, it is only through this intense logistical undertaking inside prisons, an undertaking that may not end as soon as Mr. Sanchez's sentence.

The current circumstances are unprecedented. They profoundly affect the 3553(a) calculus and justify a variance to 24 months imprisonment on several grounds, including avoiding unwanted sentencing disparities.

### C. Using Methamphetamine Purity, Under § 2D1.1, to Arrive at Base Offense Level 34 is Arbitrary, Unsound, and Outdated

One of the most aggravating facts in this case, accounting for 3 Offense Levels, is that the controlled substances in this case were sent to a laboratory for purity testing, so the "actual methamphetamine" guidelines apply. That decision led to a Base Offense Level of 34 rather than 31. A sentence should not depend so heavily on a fortuitous investigative decision or on an arbitrary 10:1 sentencing ratio. While this guideline is correct, it must be examined under 3553(a).

While the Guidelines must serve as the "starting point and the initial benchmark" of the sentencing inquiry, the Court "may not presume that the Guidelines range is reasonable." *Gall v.*

*United States*, 552 U.S. 38, 49-50 (2007).  District courts may vary from the guidelines on policy grounds, *see Kimbrough v. United States,* 552 U.S. 85, 106-07 (2007); and have the authority to determine that the guidelines yield "an excessive sentence in light of the sentencing factors outlined in 18 U.S.C. § 3553(a)," *Spears v. United States*, 555 U.S. 261, 264 (2009).

Unlike most other guidelines applicable to controlled substance offenses, the guidelines for methamphetamine offenses distinguish between two forms of the substance – actual and mixture.  *See* USSG § 2D1.1(c).  The base offense level is determined either by the actual methamphetamine contained within a mixture or by the weight of the entire mixture containing a detectable amount, whichever results in a higher base offense level. USSG § 2D1.1(c)(B).

There is a 10:1 ratio between "actual" or pure methamphetamine, and a mixture/substance weight of methamphetamine.  But, as several district courts have concluded, there is no "empirical data from the Sentencing Commission or in the academic literature which would justify the ratio."  *United States v. Boyd*, 437 F. Supp. 3d 830, 832 (D. Idaho 2020); *see also United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013) (varying downward from 151-118 months to 75 months); *United States v. Carrillo*, 2020 WL 885582 (E.D. Cal. Feb. 24, 2020) (granting variance because purity is neither a proxy for, nor probative of, a defendant's role or position in distribution).  "Rather, these distinctions seem to be tiered to a similar 10:1 ratio used in the mandatory minimum sentences imposed by Congress."  *Id.*  As these and other courts have recognized, neither the distinction between "actual" and "mixture" methamphetamine nor the stark disparity in their respective advisory ranges makes much sense.

First, the reliance on purity is based on an outdated and false assumption that "unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."  *Boyd*, 437 F. Supp. 3d at 832 (quoting USSG § 2D1.1 cmt. 9); *see also United States Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018) (finding that purity is an outdated proxy for relative culpability); *United States v. Johnson*, 379 F. Supp. 3d 1213 (M.D. Ala. 2019) (rejecting the methamphetamine guidelines' 10-to-1 ratio because it is "based on a flawed assumption that methamphetamine purity is a proxy for role in the offense").

Here, for example, the methamphetamine was very pure. This is not atypical. In fact, as this Court is well aware, 99% pure methamphetamine is commonplace, particularly in California, with its close proximity to super labs operated by drug cartels in Mexico. Especially on the West Coast, the purity of methamphetamine has continued to increase while the price has plummeted.[2] The DEA reported in 2018 that methamphetamine purity "remains at record highs" and that the average purity in the last quarter of 2016 was 94.0%. *See* DEA Intelligence Report at 3-4. According to data compiled by the DEA, California is near the top of all states in terms of the purity of available methamphetamine. Moreover, there is no evidence Mr. Sanchez had any idea the methamphetamine he possessed was 99% pure. He appears to have had very little knowledge of methamphetamine and simply followed instructions that were texted to him. The purity of the methamphetamine Mr. Sanchez possessed is in no way an indicator of Mr. Sanchez's position within the drug distribution hierarchy. It is abundantly clear, and not disputed, that Mr. Sanchez was a low-level courier.

Second, relying on methamphetamine purity virtually guarantees that a defendant's base offense level will be substantially higher in cases where the methamphetamine is tested for purity, even though the act of testing in a given case is entirely arbitrary. *See United States v. Ferguson* 2018 WL 3682509 (D. Minn. Aug. 2, 2018). The methamphetamine may not be tested in a particular case because the authorities seized only some of the drugs; because the labs are too busy to complete the testing before sentencing; because the defendant pleads guilty to avoid purity testing; or because the case originated with a state agency where testing could not be completed in a timely manner or simply was not done. This "potentially leads to a perverse game of beat the clock, whereby an accused may try to plead guilty and get sentenced before lab results come back, so that his offense is treated as involving a methamphetamine mixture rather than actual/pure methamphetamine." *Id.* at *4. "A lab technician's work speed should not determine the number of years a person spends behind bars." *Id*.

---

[2] *See* DEA Intelligence Report (July 2018), https://news.umd.edu/sites/ndews.umd.edu/files/dea-2016-national-drug-price-purity-data.pdf; *see also* American Addiction Centers Editorial Staff, "Drug Purities in America" (Aug. 1, 2019), available at https://lagunatreatment.com/addiction-research/drug-purities-in-america/.

SENTENCING MEMORANDUM
*SANCHEZ*, CR 21–0113 YGR

In Mr. Sanchez's case, this is precisely what happened. The drugs happen to have been tested for purity before plea discussions began. Mr. Sanchez sat in state custody for five months. PSR ¶ 4. In other cases, including cases before this Court, the drugs have not been tested. In such cases, the offense level is calculated using the "mixture/substance" guideline, even though the methamphetamine might actually be very pure. *See, e.g., Boyd*, 437 F. Supp. 3d at 833. Identical offense conduct results in wildly different guidelines ranges, based solely on the arbitrary decision of whether to forgo testing. *See United States v. Rodriguez*, 382 F. Supp. 3d 892 (D. Alaska 2019) (downward variances warranted to correct for disparity based solely on whether methamphetamine was tested and purity). The fact that the drugs happened to have been tested in Mr. Sanchez's case has nothing to do with his culpability, the danger he may pose to society, or the nature and circumstances of the offense, all factors that 18 U.S.C. § 3553 requires this Court to consider. *See id.* at 898. It reflects only the nature and circumstances of the *investigation*, which is not a sentencing factor.

Because the drugs were tested, Mr. Sanchez's base offense level is 34. *See* PSR ¶ 18. This results in a total offense level of 27 (70-87 months). If the drugs had not been tested for purity, the base offense level would have been 31 (3 levels lower), and the adjusted offense level would be 24 (51-63 months). *See* USSG § 2D1.1(a)(5) and (c)(3). In short, Mr. Sanchez's guideline range is dramatically increased because the drugs were tested. The defense respectfully contends that such a drastic swing is arbitrary, unwarranted, and does not align with "the need for the sentence imposed ... to reflect the seriousness of the offense," as required by 18 U.S.C. § 3553(a)(2)(A); or the need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," in accord with 18 U.S.C. § 3553(a)(6). An unwarranted sentencing disparity necessarily exists because drugs are not tested in every case. This fact undermines the very purpose of the sentencing guidelines – to create national uniformity and eliminate arbitrary disparities that have nothing to do with the offense conduct. For this reason, the Court should vary downward to 51 months on this basis alone, and from there, based on the other compelling reasons in this case, vary downward to a sentence of 24 months.

### D. Mr. Sanchez's aberrant conduct calls for a variance.

Mr. Sanchez made a grievous mistake that has altered his life and the lives of his family members. He is good person who is not likely to break the law again. He will be deported for life. The aberrant nature of Mr. Sanchez's conduct is a key fact when considering several of the most important sentencing factors: protection of the community, rehabilitation, and specific deterrence. Mr. Sanchez is no threat to the community, and a severe prison sentence is not required to correct his behavior. Mr. Sanchez was used by a drug trafficking organization to shield them from exposure and responsibility and he will not repeat this mistake again. The circumstances of this case call for a variance to two years prison.

### IV. CONCLUSION

Based on the foregoing, the defense respectfully requests that Mr. Sanchez be sentenced to 24 months prison, followed by three years of supervised release.

Dated: October 28, 2021

Respectfully submitted,

GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California

　　　　　　　/S
JOHN PAUL REICHMUTH
Assistant Federal Public Defender